UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DEON SANTOS, | Case No.: |
| vs. | **COMPLAINT FOR:** |
| UNITED NETWORK FOR ORGAN SHARING; TUFTS MEDICAL CENTER; and MASSACHUSETTS GENERAL BRIGHAM INCORPORATED | **(1) VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964;** |
| Defendants. | **(2) VIOLATION OF SECTION 98 OF CHAPTER 272, CRIMES AGAINST CHASTITY, MORALITY, DECENCY AND GOOD ORDER** |
| | **DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff Deon Santos brings this Complaint against the United Network for Organ Sharing ("UNOS"), Tufts Medical Center, and Mass General Brigham Incorporated ("Mass General" and collectively, the "Defendants"), and alleges as follows:

## INTRODUCTION

1.      For more than two decades, UNOS and its approved, partner transplant hospitals used what is known as the race-based coefficient to artificially increase the observed kidney function (eGFR) scores for Black kidney disease patients. The race-based coefficient delayed Black kidney disease patients from being added to the kidney transplant waitlist and resulted in Black candidates waiting much longer for kidney transplants than similarly situated non-Black candidates.

2.      Use of the race-based coefficient did not result from any valid scientific or peer-reviewed studies. Instead, developers of the race-based coefficient postulated that Black Americans showed increased levels of creatinine extraction because they were alleged to have greater muscle mass than non-Black Americans; i.e., the developers relied solely on a racial stereotype and flawed studies.

3.      Making medical policy based on racial stereotypes harmed all Black Americans waiting for a kidney. This lawsuit focuses on one of them—Mr. Deon Santos.

4.      Mr. Santos held a Class A truck driving license and hoped to pursue a career in truck driving to support his long-time girlfriend and their seven children. Unfortunately, kidney disease has made this impossible.

5.      Mr. Santos was first diagnosed with kidney disease in 2007. He began enduring "regular chronic dialysis" in 2008. Today, Mr. Santos receives dialysis for eight hours a day, seven

days a week.

6.     After his diagnosis, Mr. Santos found it impossible to undergo dialysis and pursue a career as a truck driver. Mr. Santos's life has been devastated by the length of his time on dialysis waiting for a kidney, and its negative effect on his ability to work.

7.     Mr. Santos also prided himself on his physical fitness and athleticism, exercising with his friends not only as a means to stay healthy, but as a hobby and to socialize. Prolonged dialysis treatments have rendered such activities a thing of the past.

8.     Mr. Santos also found himself in an unfortunate dilemma: He could either marry his high school sweetheart, and the mother of his children, or keep access to Medicare, which covered the costs of his dialysis. Mr. Santos's deteriorating health forced him to prioritize insurance coverage.

9.     From the moment he went on dialysis, Mr. Santos feared for his life. He understood that many dialysis patients do not live for more than four or five years after starting treatments.

10.     Upon information and belief, Mr. Santos was first added to the national kidney waitlist in 2008 when he started dialysis, referred by Tufts. He bided his time, undergoing dialysis, until he was offered a kidney.

11.     Finally, in January of 2014, after approximately six years of waiting and dialysis, Mr. Santos received a kidney transplant. Upon information and belief, but for Tufts' and UNOS's use of the race-based coefficient, Mr. Santos would have been added to the waitlist earlier, and received a kidney transplant in less than six years. Indeed, the average wait time for a donor kidney is only three to five years.

12.     But because Mr. Santos's health had deteriorated during the years while he awaited a donor kidney at Tufts, Mr. Santos's "new" kidney failed within a few years. Mr. Santos was

informed that, if he had gotten a kidney transplant sooner, he would not have become so sick and his body would have been less likely to reject the donor kidney.[1]

13. After his first kidney failed, Mr. Santos began chronic dialysis again by no later than July of 2019. From the moment he went back on dialysis, Mr. Santos feared for his life. Again, he understood the life expectancy for dialysis patients, and further understood from first-hand experience the toll dialysis took on his body from the first time he waited for a kidney.

14. Mr. Santos was added to the national kidney waitlist by Mass General on or about July of 2019 when he began dialysis. Since that time, and continuing to the present, Mr. Santos has received dialysis continuously, seven days a week.

15. As a result of Mr. Santos's ongoing medical needs, he has lost not only trust in the systems meant to care for those with kidney disease but also his family and friends. Mr. Santos's long-time romantic partner, the mother of his children, is leaving him due to the stress that his constant medical needs have put on their relationship. Mr. Santos's friends, with whom he used to socialize and exercise, no longer visit.

16. The source of all of these physically and mentally traumatizing events? Defendants' use of the race-based coefficient to taint Mr. Santos's—and countless other Black patients'—eGFR scores. Scores that Defendants now admit were artificially adjusted in a racist manner from the beginning.

17. In June of 2022, UNOS admitted to the racially discriminatory nature of the race-based coefficient for Black Americans. Thereafter, UNOS approved "a measure to require

---

[1] To be clear, at this time, Mr. Santos was not told that the race-based coefficient was applied to his lab scores, nor was he aware that his race impacted the calculation of his wait time. This is not surprising because the race-based coefficient was generally applied covertly without notice to or discussion with patients.

transplant hospitals to use a race-neutral calculation when estimating a patient's level of kidney function." In its press release, UNOS explained:

> For a number of years, some eGFR calculations have included a modifier for patients identified as Black. This practice has led to a systemic underestimation of kidney disease severity for many Black patients. Specifically in organ transplantation, it may have negatively affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant.[2]

Despite outlawing future use of the race-based coefficient, for six months, UNOS did nothing to adjust wait times for Black Americans already on the kidney waitlist.

18.     In January of 2023, UNOS instructed donor hospitals to notify Black candidates of the policy change and investigate whether Black members of their waitlists were eligible for a wait time modification. UNOS gave donor hospitals *an entire year* to complete this process.

19.     On February 9, 2024—*over one year after* UNOS notified donor hospitals that they must no longer rely on the race-based coefficient and *after* Mass General's deadline to comply with UNOS's mandate—Mass General notified Mr. Santos that he is eligible for a wait time adjustment of 10 months.

20.     After learning that the Defendants engaged in intentional, racial discrimination, and that he had not received fair consideration for a kidney, Mr. Santos understandably became depressed.

21.     Doubling down on their original use of the race-based coefficient and failure to comply with UNOS's requirement to timely update Mr. Santos's wait time, Mass General marked Mr. Santos as "inactive" on the waitlist because he suffers from depression. This made Mr. Santos

---

[2] This Press release is publicly available at https://unos.org/news/optn-board-approves-elimination-of-race-based-calculation-for-transplant-candidate-listing/.

indefinitely ineligible to be considered for a donor kidney, despite his nearly six years on the waitlist. In other words, Mass General decided that because Mr. Santos was too upset that racial discrimination increased his wait time, he could not be considered for a kidney at all, essentially sentencing Mr. Santos to death unless this decision is reversed.

22.     There must be serious consequences for hospitals and transplant organizations that engage in racist discrimination.

## PARTIES

23.     Mr. Santos is an individual residing in New Bedford, Massachusetts.

24.     Mr. Santos is informed and believes, and hereby alleges, that Defendant UNOS is a Virginia nonprofit corporation with its principal place of business in Richmond, Virginia.

25.     Mr. Santos is informed and believes, and hereby alleges, that Defendant Tufts is a non-profit corporation with its principal place of business in Boston, Massachusetts.

26.     Mr. Santos is informed and believes, and hereby alleges, that Defendant Mass General is a non-profit corporation with its principal place of business in Boston, Massachusetts.

## JURISDICTION AND VENUE

27.     This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 because Mr. Santos asserts a federal cause of action alleging racial discrimination. This Court further has supplemental jurisdiction over any state-law claims pursuant to 28 U.S.C. § 1367.

28.     Venue in this district is proper pursuant to 28 U.S.C. § 1391 because Mr. Santos resides in this District and has been affected by Defendants' unlawful policies and procedures within this District. Each of the Defendants have transacted with Mr. Santos within the District. Thus, a substantial part of the events or omissions that gave rise to the claims asserted here

occurred within this District.

29.     This Court has personal jurisdiction over UNOS because UNOS conducts operations within Massachusetts by virtue of its management of the kidney donor list for all patients residing within the State, including Mr. Santos. UNOS makes decisions about which patients residing in Massachusetts will be offered donor kidneys.

30.     This Court has personal jurisdiction over Tufts because Tufts maintains its principal place of business within the State, and harmed Mr. Santos because of the unlawful conduct alleged here within this State.

31.     This Court has personal jurisdiction over Mass General because Mass General maintains its principal place of business within the State, and harmed Mr. Santos because of the unlawful conduct alleged here within this State.

## GENERAL ALLEGATIONS

**A.      The national kidney transplant waitlist is controlled by the Defendants, and wait time is the primary factor considered in awarding donor kidneys.**

32.     In 1984, Congress passed the National Organ Transplant Act ("NOTA"), creating the Organ Procurement and Transplantation Network ("OPTN"), which was tasked with maintaining a national registry for organ matching. Under the Act, this registry was to be operated by a private, non-profit organization under federal contract.[3]

33.     Since then, UNOS has acted as that private, non-profit organization. As its website declares, UNOS "[m]anag[es] the national transplant waiting list, matching donors to recipients 24 hours a day, 365 days a year." UNOS establishes and implements policy about how donor

---

[3] Patients can also seek a kidney from a private donor, such as a family member or friend, at the same time as they wait for a kidney on the national waitlist.

kidneys will be awarded to patients with kidney disease.

34.     UNOS is contractually obligated to manage the national kidney waitlist, but does not allow kidney disease patients to apply for inclusion on the kidney transplant waitlist directly through UNOS.

35.     To be placed on the national kidney transplant waitlist, a patient must first visit one of 200+ transplant hospitals and receive a referral from his physician. In this way, the transplant hospitals, like Tufts and Mass General, serve as gatekeepers to patients seeking to be placed on the national kidney waitlist.

36.     UNOS must approve these transplant hospitals before they are eligible to refer patients to the kidney transplant waitlist. Hospitals like Tufts and Mass General must agree to be bound by UNOS's published policies and procedures to act as a transplant hospital. They then act as UNOS's agent in managing the national transplant waitlist.

37.     The national kidney waitlist is maintained using UNOS software, known as UNet. When a new patient is added to the waitlist, the referring hospital enters the patient's name and relevant medical information, including eGFR scores, into the UNet software, which tracks patient medical information and wait time.

38.     Each time a donor kidney becomes available, UNet's algorithm considers the information maintained in UNet, generates a list of potential matches, and ranks potential matches on the national kidney waiting list. These kidneys are then offered to patients through the transplant hospitals, in accordance with the UNet-generated rankings. This ranked list is known as a match run. These kidneys are then offered to patients through the transplant hospitals, in accordance with the UNet-generated rankings.

39.     In the UNet algorithm, qualifying wait time is worth 1/365 points per day, or one

point per year. These wait time points are a significant factor in determining candidates' ranking in UNet's match runs, and ultimately which candidate will be awarded any particular kidney.

40.     Indeed, because all other factors for which candidates are assigned points are race-neutral, wait time acts as a sort of tie breaker between similarly situated Black and non-Black candidates. From the point the race-based coefficient was first applied, until their wait-times were adjusted to eliminate consideration of race, Black candidates accrued less wait time than similarly situated non-Black candidates. Non-Black candidates therefore appeared higher in match runs, and were awarded kidneys first.

41.     Importantly, referral to the waitlist does not automatically start the clock on qualifying wait time. Generally, to accrue qualifying wait time, either a patient's eGFR score must fall below 20 ml/min or the patient must begin dialysis.

**B.     The Defendants applied a racially discriminatory coefficient to Black patients' eGFR scores.**

42.     UNOS is responsible for enacting policy that determines which patients receive which donor kidneys. In this way, UNOS offers as one of its strategic goals to "[p]rovide equity in access to transplants[.]" UNOS has fallen far short of its stated goal.

43.     For decades, the race-based coefficient was applied to artificially inflate eGFR scores for Black Americans, overstating their kidney function by 16–18%, based on the underlying assumption that Black Americans have greater muscle mass and thus naturally have more creatinine in their bodily systems.

44.     As noted above, patients do not begin accruing wait time on the national kidney waitlist until their eGFR score reaches 20 ml/min. But for Black patients, even when their unadjusted eGFR score fell below 20 ml/min, the race-based coefficient artificially inflated their

eGFR scores above 20 ml/min, preventing them from qualifying to accrue wait time. Thus, Black patients' eGFR scores had to fall well below 20 ml/min before they began to accrue wait time.

45.     This practice led to many Black kidney disease patients never qualifying for wait time by eGFR score, their addition to the waitlist delayed until the start of dialysis (which is recommended when kidney function falls below 15 ml/min). This is what happened to Mr. Santos.

46.     UNOS's policy encouraged and allowed for use of the race-based coefficient, and UNOS knowingly used modified eGFR scores and manipulated wait times when ranking patients for kidney transplants. Specifically, UNOS is and has at all times been aware that its UNet software includes an algorithm that uses wait time as the primary factor in ranking patients for donor kidneys, and that its UNet software includes wait times for Black patients that have been manipulated by application of the race-based coefficient, including Mr. Santos's original wait time calculation. To be clear, this modification was made to Black patients' eGFR scores entirely because of their race and was not applied to other racial groups.

47.     There has never been any serious scientific research to support use of the race-based coefficient to artificially increase Black patients' eGFR scores. Instead, the race-based coefficient is based on eugenics-style racism and stereotypes that assume Black Americans are more physically fit than White Americans and other racial groups.

48.     This, of course, is junk science supported only by racial stereotypes, and not any valid scientific studies. As described in an article titled *Systemic Kidney Transplant Inequities for Black Individuals: Examining the Contribution of Racialized Kidney Function Estimating Equations*, the theory supporting the race-based modification to Black patients' eGFR scores has "not been substantiated by rigorous scientific evidence[.]"

49.     Years before UNOS took any action to review its policy allowing for use of the

race-based coefficient, the practice was criticized by doctors for its racially discriminatory nature. For example, in November of 2011, Dr. Toni Martin published an article in the *American Journal of Kidney Diseases* that questioned the practice, explaining that when she attempts to explain the policy to Black patients, she "get[s] a snort of disbelief[,]" and noting the history of purported genetic differences being used against Black Americans against a backdrop of "separate and unequal."[4]

50.     Use of the race-based coefficient seriously diminishes Black patients' chances of receiving a donor kidney. For Black patients that overcome the odds and do receive a kidney from the national waitlist, their wait time is still significantly increased. Again, because of this eGFR manipulation, many Black patients never qualified to accrue wait time because of their eGFR score, and only began to accrue wait time when they began dialysis.

51.     All other factors being equal, the above-described practices have resulted in non-Black patients receiving many kidneys that would otherwise have been given to Black applicants had their wait time been calculated without consideration of race.

52.     The failure to receive donor kidneys has caused significant harm to Black Americans. The unfortunate reality is that many Black Americans who could have survived if fairly considered for a donor kidney have already passed away. Mr. Santos may very well face the same fate if Mass General continues to mark him as "inactive" on the waitlist.

53.     Other Black Americans have suffered worsened kidney disease and/or been forced into dialysis treatment because of the lengthened wait time for a donor kidney. These Black

_____

[4] To be clear, Mr. Santos was unaware of this article. Again, Mr. Santos was unaware that his race affected his position on the waitlist, and unaware the race-based coefficient was applied to his eGFR scores, until February of 2024, when he received a letter from Mass General notifying him that he had received a wait-time adjustment. That February 2024 letter also refers to a prior letter from March of 2023, but Mr. Santos does not recall ever receiving or reviewing that letter.

Americans have suffered economic damages in the form of medical expenses and lost wages.

C.      **Even after UNOS admitted that the race-based coefficient discriminates against Black Americans, Mass General refused to timely address the problem**.

54.      In June 2020, UNOS acknowledged the racial inequity plaguing the transplant system and the need for reform. In an article found at https://unos.org/news/racial-equity-in-transplantation/, UNOS professed a "commitment" to "saving and improving lives through transplantation, regardless of background, including race and ethnicity." But the race-based coefficient would remain in effect for years to come.

55.      In June 2022, UNOS admitted the racially discriminatory nature of the race-based coefficient for Black Americans, approving "a measure to require transplant hospitals to use a race-neutral calculation when estimating a patient's level of kidney function." In its press release, UNOS explained that

> For a number of years, some eGFR calculations have included a modifier for patients identified as Black. This practice has led to a systemic underestimation of kidney disease severity for many Black patients. Specifically in organ transplantation, it may have negatively affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant.[5]

56.      UNOS posted the following passage on its website:

---

[5] This Press release is publicly available at https://unos.org/news/optn-board-approves-elimination-of-race-based-calculation-for-transplant-candidate-listing/.



Organ donors     Patients

**What are other issues with the race variable in eGFR?**

EGFR calculations rely on a binary approach to race. When the race variable is used in formulas, eGFR calculators only offer two response options: "Black" or "Not Black."

These options do not include a designation for mixed race or multi-racial individuals, and do not account for the existing genetic diversity within the Black population.  The concept of race is a social construct and an unreliable proxy for genetic difference, therefore not a biological marker or clinical measure.

57.    UNOS's policy officially changed on July 27, 2022, with UNOS's policy before that time expressly allowing for use of the race-based coefficient to artificially increase Black patients' eGFR scores.

58.    Nonetheless, UNOS continued to use the race-based coefficient as a default. For more than six months, UNOS took no affirmative steps to adjust wait times and correct for previous use of the race-based coefficient.

59.    On January 5, 2023, UNOS announced a new policy that would require donor hospitals to provide two notifications to patients on the national kidney waitlist, one notifying patients that Black Americans will be considered for wait time adjustments where the race-based coefficient delayed their accrual of wait time, and a second notification confirming this process was completed and informing patients of their status. UNOS also directed donor hospitals to investigate which patients are eligible for a wait time adjustment, and to request said adjustments with UNOS within a year—by January 3, 2024.

60.    While this adjustment in policy rightfully acknowledged the racially discriminatory

nature of the race-based coefficient, it lacked the requisite urgency, and for many of the 27,500 Black Americans then on the national kidney waitlist, like Mr. Santos, the policy change was too little too late. During the 18 months of lag time in adjusting wait times, Black Americans continued to suffer a race-based disadvantage in their candidacy for a donor kidney, with UNet continuing to use the old, improperly calculated wait times when awarding kidneys.

61.     Indeed, Mass General failed to follow even UNOS's lax requirement to update Mr. Santos's wait time by January 3, 2024, Mass General did not notify Mr. Santos that he was entitled to a wait time adjustment until February 9, 2024.

**D.     As a result of Defendants' intentional, race-based discrimination, Mr. Santos has suffered significant harms**.

62.     As explained above, upon information and belief, Mr. Santos was first added to the national kidney waitlist in by Tufts in 2008 when he started dialysis, but had Tufts not used the race-based coefficient, Mr. Santos's lab scores would have qualified him to join the waitlist significantly earlier.

63.     As a result, Mr. Santos spent nearly seven years on the waitlist before he received a kidney transplant in January of 2014, undergoing excruciating dialysis treatments the entire time. This excessive wait time caused Mr. Santos's health to seriously deteriorate, and ultimately contributed to the failure of his transplanted kidney within a few years of implantation.

64.     But for Tufts's and UNOS's use of the race-based coefficient, upon information and belief, Mr. Santos would have received a donor kidney much earlier.

65.     By July of 2019, Mr. Santos's first donor kidney failed to the point he was required to re-start dialysis.

66.     Mass General registered Mr. Santos for the national kidney waitlist at this time.

67.     Since that time, Mr. Santos has been required to travel to dialysis clinics and

undergo treatment for eight hours per day, seven days per week. The treatment is grueling and drains Mr. Santos's physical and mental energy. The treatment has also caused Mr. Santos to suffer from severe emotional distress, caused physical pain, and prevented him from working or enjoying life.

68.     A former track star who relished in exercising with his friends, dialysis has broken down his body and mind. He has lost the energy required to maintain his long-time friendships, and to spend time playing with his many children and grandchildren.

69.     His all-consuming dialysis regimen, again extended and worsened by application of the race-based coefficient, has also cratered his relationship with his partner and high-school sweetheart—the mother of his seven children. Prolonged dialysis treatments have caused the couple to essentially separate; his partner moved out of their once-shared bedroom, and the pair now platonically co-parent, rather than raising their children together, as a loving couple.

70.     His medical ailments have also prevented him from sustaining a trucking job. Because of the demands of dialysis, he must rely on disability benefits. He now feels that he is unable to provide for his family in meaningful ways.

71.     Moreover, the revelation by Mr. Santos that he was a victim of intentional, racial discrimination in particular, and that this discrimination has prolonged his wait for a second donor kidney, caused Mr. Santos to suffer from depression, and struggle with suicidal thoughts. This depression is now used by Mass General against Mr. Santos, Mass General marking Mr. Santos as inactive on the waitlist such that he is indefinitely ineligible to be considered for the life-saving kidney that he needs.

72.     All of these effects could have been avoided had Defendants not discriminated against Mr. Santos. Absent Defendants' discrimination, upon information and belief, Mr. Santos

would have waited less time for his first kidney, and that kidney would not have failed, avoiding the need for a second donor kidney. And, even if Tufts's actions are set aside, Mass General caused Mr. Santos separate, discrete injuries by prejudicing his candidacy for a second donor kidney, causing him to suffer severe depression, and then marking him as inactive on the waitlist.

## FIRST CAUSE OF ACTION
### (Violation of Title VI of the Civil Rights Act of 1964)

73.     Mr. Santos re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in the paragraphs above.

74.     Mr. Santos brings this cause of action against all Defendants.

75.     UNOS, Tufts, and Mass General receive significant financial assistance from the Federal government.

76.     As to UNOS, approximately 10% of UNOS's budget is provided by the Federal government, in accordance with the National Organ Transplant Act's authorization of $7,000,000/year to fund a private, non-profit entity such as UNOS. These contracts were intended by the Federal government to act as a subsidy to UNOS, not as compensation for any goods or services provided by UNOS to the Federal government, for which there are none.

77.     Moreover, UNOS's audited financial statements describe this Federal government payment as a "Grant" and include a corresponding "Federal Assistance Lending Number." Upon information and belief, this number relates to Federal government "Assistance Listings" which, pursuant to the Federal government-run SAM.gov, "are detailed public descriptions of federal programs that provide grants, loans, scholarships, insurance, and other types of assistance awards."

78.     Mass General and Tufts both receive significant financial assistance from the Federal government and its programs, funding both patient care and related operations.

79.     Defendants have engaged in racial discrimination. As alleged in detail above,

16

Defendants allowed and encouraged use of the race-based coefficient to artificially inflate Black patients including Mr. Santos's eGFR scores, with UNOS adopting, encouraging, and implementing the race-based coefficient as policy, and its agent transplant hospitals, like Tufts and Mass General, applying the race-based coefficient directly, thus delaying Mr. Santos's accrual of wait time, and prejudicing his chances of receiving a donor kidney.

80.     Defendants further knowingly input and used these modified wait times for Black patients in UNOS's UNet software, causing Black patients to be ranked lower for specific donor kidneys than non-Black patients. Even after UNOS admitted the practice was racially discriminatory, Mass General failed to take prompt action to ensure Mr. Santos's wait times was recalculated.

81.     Even now, Mass General list Mr. Santos as "inactive" on the national kidney waitlist, leaving Mr. Santos ineligible to receive a kidney. Any ailments, such as depression, forming the basis for this decision, however, were the direct result of UNOS's and Mass General's discrimination.

82.     The damages resulting from the above-described racial discrimination include but are not limited to depriving and/or delaying Mr. Santos's award of a donor kidney. This discrimination also caused Mr. Santos to incur economic injuries, including, but not limited to, continued medical costs such as dialysis costs and lost wages stemming from unemployment because of additional dialysis treatments and other resulting medical conditions caused by application of the race-based coefficient by Defendants.

83.     The above-described racial discrimination caused additional damages including but not limited to pain and suffering, severe emotional distress because of the discrimination, fear of looming death, constant fatigue, the inability to travel, depression, and the loss of enjoyment of

life.

## SECOND CAUSE OF ACTION
**(Violation of Crimes Against Chastity, Morality, Morality, Decency and Good Order, M.G.L. Ch. 272, Sec. 98)**

84.     Mr. Santos re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in the paragraphs above.

85.     This cause of action is brought by Mr. Santos against all Defendants.

86.     UNOS operates and manages the national kidney waitlist, which constitutes a public accommodation because it is open to the general public. Mass General and Tufts act as UNOS's agent in managing the national kidney waitlist.

87.     Mass General and Tufts further operate public accommodations within the state of Massachusetts, relevantly here, transplant hospitals that are open to the general public and provide medical services in exchange for monetary compensation.

88.     Defendants engaged in racial discrimination, as described above. To the extent UNOS argues the national kidney waitlist itself is not a public accommodation, UNOS remains liable because it "aides or incites" Tuft's and Mass General's discrimination at their physical transplant hospitals.

89.     The damages resulting from the above-described racial discrimination include but are not limited to depriving and/or delaying Mr. Santos's award of a donor kidney. This discrimination also caused Mr. Santos to incur economic injuries, including, but not limited to, continued medical costs such as dialysis costs and lost wages stemming from unemployment because of additional dialysis treatments and other resulting medical conditions caused by application of the race-based coefficient by Defendants.

90.     The above-described racial discrimination caused additional damages including but

not limited to pain and suffering, severe emotional distress caused by the discrimination, constant fatigue, the inability to travel, depression, and the loss of enjoyment of life.

### PRAYER FOR RELIEF

WHEREFORE, Mr. Santos prays for relief against Defendants as follows:

1. For preliminary and permanent injunctions enjoining and restraining UNOS, Tufts, Mass General, their agents, employees, representatives, partners, joint venturers, and/or anyone acting on behalf of, or in concert with, UNOS, Tufts, or Mass General from engaging in the above-described racial discrimination, including continuing to make Mr. Santos ineligible to receive a donor kidney by marking him as inactive on the waitlist;

2. For damages in compensation for the economic and personal injuries suffered by the Mr. Santos in an amount to be determined by evidence, including but not limited to, his severe emotional distress and depression;

3. For punitive and exemplary damages in an amount according to proof;

4. For statutory damages as provided for by M.G.L. Ch. 272, Sec. 98 of the Massachusetts General Laws;

5. For pre-judgment interest on all damages awarded by this Court;

6. For reasonable attorneys' fees and costs of suit incurred herein; and

7. For such other and further relief as the Court deems just and proper.

The Plaintiff,

DEON SANTOS

By his Attorneys,


KECHES LAW GROUP, P.C.

*/s/ Jeffrey N. Catalano*
JEFFREY N. CATALANO
BBO #: 567798
jcatalano@kecheslaw.com
2 Granite Avenue, Suite 400
Milton, MA 02186
TEL: (508) 821-4371
FAX: (508) 822-8022

and          ELLIS GEORGE LLP


MATTHEW L. VENEZIA
*Pro Hac Forthcoming*
mvenezia@ellisgeorge.com
GEORGE LAIOLO
*Pro Hac Forthcoming*
glaiolo@ellisgeorge.com
2121 Avenue of the Stars, 30th Floor
Los Angeles, CA  90067
TEL: (310) 274-7100
FAX: (310) 275-5697

## DEMAND FOR JURY TRIAL

Mr. Santos hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of

Civil Procedure.


The Plaintiff,

DEON SANTOS

By his Attorneys,


KECHES LAW GROUP, P.C.

*/s/ Jeffrey N. Catalano*
JEFFREY N. CATALANO
BBO #: 567798
jcatalano@kecheslaw.com
2 Granite Avenue, Suite 400
Milton, MA 02186
TEL: (508) 821-4371
FAX: (508) 822-8022

and                          ELLIS GEORGE LLP


MATTHEW L. VENEZIA
*Pro Hac Forthcoming*
mvenezia@ellisgeorge.com
GEORGE LAIOLO
*Pro Hac Forthcoming*
glaiolo@ellisgeorge.com
2121 Avenue of the Stars, 30th Floor
Los Angeles, CA  90067
TEL: (310) 274-7100
FAX: (310) 275-5697


DATED:  JUNE 28, 2024