UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DEON SANTOS,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED NETWORK FOR ORGAN SHARING, TUFTS MEDICAL CENTER, and MASSACHUSETTS GENERAL BRIGHAM INCORPORATED,<br><br>    Defendants. | Civil Action No. 1:24-cv-11692-IT |
| MARK THOMPSON,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED NETWORK FOR ORGAN SHARING and MASSACHUSETTS GENERAL BRIGHAM INCORPORATED,<br><br>    Defendants. | Civil Action No. 1:24-cv-11693-IT |

CONSOLIDATED MEMORANDUM AND ORDER

September 10, 2025

Plaintiffs in the above-captioned cases allege racial discrimination in the administration of the national kidney transplant waiting list in violation of Title VI of the Civil Rights Act and Massachusetts General Laws c. 272, § 98. In the first-filed case, 1:24-cv-11692, Deon Santos brings claims against Defendants United Network for Organ Sharing ("UNOS"), Massachusetts General Brigham Incorporated ("Massachusetts General Brigham"), and Tufts Medical Center ("Tufts"). In the related case, 1:24-cv-11693, Mark Thompson brings claims against UNOS and Massachusetts General Brigham. UNOS moved to dismiss each case under Federal Rules of

Civil Procedure 12(b)(1) and 12(b)(6). Mot. to Dismiss [Doc. No. 11]; Mem. ISO Mot. to Dismiss [Doc. No. 12].[1] In this consolidated Memorandum and Order, the court dismisses Plaintiffs' request for injunctive relief as to UNOS and otherwise denies UNOS's motions.[2]

## I.    Facts As Alleged in the Complaints

### A.    *Defendant UNOS and the National Kidney Transplant Waitlist*

In 1984, Congress passed the National Organ Transplant Act, creating the Organ Procurement and Transplantation Network ("OPTN"), which was tasked with maintaining a national registry for organ matching. Compl. ¶ 32 [Doc. No. 1]; see also 42 U.S.C. § 274(a)–(b). Under the Act, this registry is to be operated by a private, non-profit organization under federal contract. Compl. ¶ 32 [Doc. No. 1]; but see 42 U.S.C. § 274(b)(1)(A) ("The Organ Procurement and Transplantation Network shall . . . be operated through awards to public or private entities made by the Secretary that are distinct from the awards made to support the organization tasked with supporting the board of directors[.]").

UNOS is a private, non-profit organization that manages the OPTN. Compl. ¶¶ 32–33 [Doc. No. 1]. UNOS establishes and implements policy regarding how donor kidneys will be awarded to patients with kidney disease. Id. ¶ 33. Approximately 10% of UNOS's budget is provided by the federal government. Id. ¶ 76. UNOS's audited financial statements describe the federal government payment as a "[g]rant" and include a corresponding "Federal Assistance Lending Number." Id. ¶ 77.

---

[1] Where relevant material is the same or substantially similar in both cases, the court has cited to that material in docket entries only in the first-filed case.

[2] The court will separately address the other Defendants' pending motions to dismiss. See Tufts Mot. [1:24-cv-11692 Doc. No. 24]; Massachusetts General Brigham Mot. [1:24-cv-11692 Doc. No. 30]; Massachusetts General Brigham Mot. [1:24-cv-11693 Doc. No. 24].

UNOS manages the national kidney transplant waiting list, which matches kidney donors to recipients. Id. ¶ 33. UNOS does not allow kidney disease patients to apply directly for inclusion on the kidney waitlist. Id. ¶ 34. To be placed on the national kidney transplant waitlist, patients must first visit one of over 200 transplant hospitals and receive a referral from their physician. Id. ¶ 35. UNOS must approve transplant hospitals before they are eligible to refer patients to the kidney transplant waitlist. Id. ¶ 36. Transplant hospitals must agree to be bound by UNOS's published policies and procedures to act as a transplant hospital. Id.

The waitlist is maintained using UNOS software called UNet. Id. ¶ 37. The software tracks patient medical information and wait time. Id. The referring transplant hospital adds a new patient to the waitlist by entering the patient's name and relevant medical information, including estimated glomerular filtration rate ("eGFR") scores, into the UNet software. Id. Each time a donor kidney becomes available, UNet's algorithm generates and ranks a list of potential matches. Id. ¶ 38. This ranked list is known as a "match run." Id. Kidneys are then offered to patients through the transplant hospitals in accordance with UNet-generated rankings. Id.

The UNet software includes an algorithm that uses wait time as the primary factor in ranking patients for donor kidneys. Id. ¶ 46. "Wait time points" are a significant factor in determining a candidates' ranking in UNet's match runs. Id. ¶ 39. One day of qualifying wait time is worth 1/365 points in the UNet algorithm. Id. ¶ 39. Referral to the waitlist does not automatically start the clock on qualifying wait time. Id. ¶ 41. To accrue qualifying wait time, either a patient's adjusted eGFR must fall below 20 mL/min or the patient must begin dialysis. Id.

For decades, a race-based coefficient was applied to eGFR scores for Black patients seeking kidney transplants, overstating their kidney function by 16–18%. Id. ¶ 43. When Black

patients' unadjusted eGFR score fell below 20 ml/min, the race-based coefficient could inflate their eGFR score above 20 ml/min, preventing them from qualifying to accrue wait time. Id. ¶ 44. The race-based coefficient led to many Black kidney disease patients never qualifying for wait time based on eGFR score, and instead having their addition to the waitlist delayed until the start of dialysis, which is recommended when kidney function falls below 15 ml/min. Id. ¶ 45.

There has never been any serious scientific research to support the use of a race-based coefficient to artificially increase Black patients' eGFR scores. Id. ¶ 47. The race-based coefficient was based on an underlying assumption that Black Americans have greater muscle mass and thus naturally have more creatinine in their bodily systems than individuals of other races. Id. ¶¶ 43, 47. At least two articles challenging use of the race-based coefficient as unsubstantiated were published during the time this policy was in effect (one published in November 2011) and the practice had been criticized by doctors for its racially discriminatory nature. Id. ¶¶ 48–49.

> In June 2022, UNOS admitted that
>
> [f]or a number of years, some eGFR calculations [had] included a modifier for patients identified as Black. This practice has led to a systemic underestimation of kidney disease severity for many Black patients. Specifically in organ transplantation, it may have negatively affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant.

Id. ¶ 17. UNOS subsequently approved a measure to require transplant hospitals to use a race-neutral calculation when estimating a patient's level of kidney function. Id. UNOS officially changed its policy to discontinue use of the race-based coefficient on July 27, 2022. Id. ¶ 57.

For six months, UNOS took no affirmative steps to adjust wait times for Black candidates already on the kidney transplant waitlist. Id. ¶¶ 17, 58. On January 5, 2023, UNOS announced a new policy requiring donor hospitals to notify patients that Black Americans will be considered for wait time adjustments where the race-based coefficient delayed their accrual of wait time, to

4

investigate which patients are eligible for a wait time adjustment, to request any adjustments with UNOS by January 3, 2024, and to notify patients of their status. Id. ¶ 59.

    B.    *Plaintiff Santos*

Plaintiff Deon Santos is Black, see id. ¶ 3, and resides in Massachusetts, id. ¶ 23. Santos was diagnosed with kidney disease in 2007. Id. ¶ 5. He began regular chronic dialysis in 2008 and was referred to the national kidney waitlist at that time. Id. ¶¶ 5, 10. Santos received a kidney transplant in January 2014, approximately six years after he was referred to the waitlist. Id. ¶ 11. The average wait time for a donor kidney is three to five years. Id.

Because Santos' health had deteriorated while he was waiting for the transplant, his new kidney failed within a few years. Id. ¶ 12. Santos began regular dialysis again by July 2019 and was added to the waitlist again on or around this time. Id. ¶¶ 13–14. Since beginning dialysis, he has received treatment for eight hours per day, seven days per week. Id. ¶¶ 5, 14.

On February 9, 2024—over one year after UNOS notified donor hospitals that they must no longer rely on the race-based coefficient—Santos was notified that he was eligible for a transplant wait time adjustment of 10 months. Id. ¶ 19. Santos became depressed following this notification, id. ¶ 20, and Massachusetts General Brigham marked Santos as "inactive" on the kidney waitlist because he suffers from depression, making him indefinitely ineligible to be considered for a donor kidney, id. ¶ 21.

    C.    *Plaintiff Thompson*

Plaintiff Mark Thompson is Black, Compl. ¶ 3 [1:24-cv-11693 Doc. No. 1], and resides in Massachusetts, id. ¶ 29. Thompson was diagnosed with polycystic kidney disease in or about 2007 or 2008. Id. ¶ 6. In July 2017, Thompson's kidney disease worsened to the point where he was forced to begin dialysis. Id. ¶ 7. Thompson was first added to the kidney waitlist at this time. Id. ¶ 7.

On April 2, 2021, Thompson had to undergo a surgical procedure to remove both of his kidneys. Id. ¶ 18. On or about this time, it was discovered that both of his kidneys had become cancerous while he was waiting for a donor kidney. Id. Because of his cancer diagnosis, Thompson is listed as "inactive" on the UNOS transplant list for five years. Id. ¶ 19. This means that the earliest Thompson can be considered for a kidney transplant will be 2026. Id.

In August 2023, after UNOS instructed donor hospitals to notify Black candidates of the policy change and investigate whether Black members of their waitlists were eligible for a wait-time modification, Thompson was notified that he was entitled to a transplant wait time adjustment. Id. ¶ 23–24. He should have been added on September 12, 2016 (per a qualifying lab test) absent application of the race-based coefficient, instead of in July 2017 when he began dialysis. Id. ¶ 24. However, Thompson remains inactive on the waitlist until at least 2026 because of his health. Id. ¶ 25. Because Thompson is inactive until 2026, he will not be considered for a kidney with the appropriate amount of wait time until approximately a decade after he first should have qualified for the national kidney waitlist. Id. ¶ 27.

## II.    Plaintiffs' Claims Against UNOS

Thompson and Santos assert claims against UNOS for violation of Title VI of the Civil Rights Act of 1964 and violation of M.G.L. c. 272, § 98, which makes unlawful racial discrimination in places of public accommodation. Id. ¶¶ 71–88; Compl. ¶ 73–90 [1:24-cv-11692 Doc. No. 1].

## III.    Subject Matter Jurisdiction

### A.    Standard of Review

Rule 12(b)(1) is "[t]he proper vehicle for challenging a court's subject matter jurisdiction." Valentin v. Hosp. Bella Vista, 254 F.3d 358, 362 (1st Cir. 2001). Federal courts are courts of limited jurisdiction, so federal jurisdiction is never presumed. Viqueira v. First Bank,

6

140 F.3d 12, 16 (1st Cir. 1998). The party asserting jurisdiction has the burden of demonstrating the existence of federal jurisdiction. Id. At the pleading stage, the court should treat all well-pleaded facts as true and provide the plaintiff the benefit of all reasonable inferences. Fothergill v. United States, 566 F.3d 248, 251 (1st Cir. 2009). Dismissal is appropriate only when the facts alleged in the complaint, taken as true, do not support a finding of federal subject matter jurisdiction. Id.

A challenge to the court's subject matter jurisdiction must generally be addressed before addressing the merits of a case. See Acosta-Ramirez v. Banco Popular de P.R., 712 F.3d 14, 18 (1st Cir. 2013) ("Federal courts are obliged to resolve questions pertaining to subject-matter jurisdiction before addressing the merits of a case").

B.   *Discussion*

Plaintiffs seek to enjoin all Defendants and "their agents, employees, representatives, partners, joint venturers, and/or anyone acting on behalf of, or in concert with [Defendants]," "from engaging in the . . . racial discrimination" described in their Complaints. Compl., Prayer for Relief ¶ 1 [1:24-cv-11692 Doc. No. 1]. Santos also requests that Defendants be enjoined from making him "ineligible to receive a donor kidney by marking him as inactive on the waitlist." Id.

UNOS contends that Plaintiffs' requests for injunctive relief should be dismissed because Plaintiffs have not alleged a likelihood of future harm where UNOS has changed its policy to discontinue use of the race-based coefficient, Plaintiffs' eGFR scores have been recalculated, and their wait time has been modified. UNOS Mem. ISO Mot. to Dismiss 12–14 ("UNOS Mem.") [Doc. No. 12]. Plaintiffs respond that they have standing to seek injunctive relief because they continue to suffer harm caused from the alleged discrimination so long as they continue to wait for a kidney transplant. See, e.g., Santos Opp. to UNOS 7, 22–24 [1:24-cv-11692 Doc. No. 34]; Thompson Opp. to UNOS 7, 22–23 [1:24-cv-11693 Doc. No. 28].

7

The doctrine of standing is rooted in Article III of the Constitution, which confines federal courts to the adjudication of actual "cases" and "controversies." See U.S. Const. Art. III, § 2, cl. 1; Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992). Standing consists of three elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016), as revised (May 24, 2016) (quoting Defs. of Wildlife, 504 U.S. at 560-61). "Standing is not dispensed in gross[,] . . . [t]o the contrary, 'a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.'" Town of Chester, N.Y. v. Laroe Estates, Inc., 581 U.S. 433, 439 (2017) (quoting Davis v. Federal Election Comm'n, 554 U.S. 724, 734 (2008)). Therefore, a plaintiff who has standing to seek damages must also demonstrate standing to pursue injunctive relief. See id. (citing Los Angeles v. Lyons, 461 U.S. 95, 105–106 & n. 7 (1983)).

"Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." O'Shea v. Littleton, 414 U.S. 488, 495–96 (1974). However, "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring" where "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." Roe v. Healey, 78 F.4th 11, 20 (1st Cir. 2023) (quoting TransUnion LLC v. Ramirez, 594 U.S. 413, 435 (2021)).

Plaintiffs lack standing to seek injunctive relief preventing UNOS from engaging in discrimination via its alleged policy that encouraged and allowed hospitals to apply race-based eGFR adjustment. Plaintiffs have alleged that UNOS changed its wait time policy require transplant hospitals to use a race-neutral calculation when estimating a patient's eGFR score,

8

instructed donor hospitals to notify affected candidates of the policy change, and instructed donor hospitals to investigate whether Black members on the waitlist were eligible for wait time modifications. See, e.g., Compl. ¶¶ 17–18 [Doc. No. 1]. And Plaintiffs allege that they were in fact notified of their eligibility for a wait time adjustment Id. ¶ 19; Compl. ¶ 24 [1:24-cv-11693 Doc. No. 1]. Moreover, Plaintiffs do not contend that UNOS is likely to re-adopt a policy that allows eGFR adjustments based on race. Consequently, enjoining UNOS from encouraging and allowing hospitals to apply a race-based eGFR adjustment—the primary injunctive relief Plaintiffs request—would not redress any injury.

UNOS does not address Santos's further request to enjoin Defendants from "marking him as inactive on the waitlist." Compl., Prayer for Relief ¶ 1 [1:24-cv-11692 Doc. No. 1]. The court notes, however, that Santos alleges that Massachusetts General Brigham, not UNOS, has marked him "inactive" on the kidney waitlist Id. ¶ 21. This allegation is thus an insufficient basis for injunctive relief as to UNOS.

Accordingly, UNOS' Motion to Dismiss Plaintiffs' request for injunctive relief as to UNOS is granted.

IV.    **Failure to State a Claim**

A. *Standard of Review*

In evaluating a motion to dismiss for failure to state a claim, the court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. at 555 (internal citations omitted). "A

9

claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

  B. *Title VI*

    1. Intentional Discrimination

UNOS argues that Plaintiffs have not alleged facts demonstrating intentional discrimination sufficient to support their Title VI claims where transplant hospitals calculated eGFR scores, and where UNOS had a written policy that was silent as to how transplant hospitals should calculate eGFRs and did not encourage the use of a race-based approach. UNOS Mem. 6–7 [Doc. No. 12]. UNOS further argues that Plaintiffs have not identified any policy statement, press release, or document advocating for the use of a race-based coefficient. Id. at 7.

Title VI of the Civil Rights Act provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. This statute prohibits only intentional discrimination. Alexander v. Sandoval, 532 U.S. 275, 281 (2001). Discriminatory intent "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979). To satisfy this standard, Plaintiffs must allege "more than intent as volition or intent as awareness of consequences." Id.

Plaintiffs have sufficiently pled intentional discrimination by UNOS where they have alleged that UNOS adopted a policy that on its face encourages transplant hospitals to treat kidney transplant candidates differently based on their race. Race-based classifications are harmful in and of themselves. See Students for Fair Admissions, Inc. v. President & Fellows of

10

Harvard Coll., 600 U.S. 181, 220–221 (2023) (explaining race-based stereotyping "can only cause continued hurt and injury" (quoting Edmonson v. Leesville Concrete Co., Inc., 500 U.S. 614, 631 (1991) (internal quotations and alterations omitted)). And a facially discriminatory policy constitutes intentional discrimination regardless of the motive for that policy. See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc., 499 U.S. 187, 199 (1991) (explaining "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect" and does not "alter the intentionally discriminatory character of the policy"). Consequently, UNOS's alleged policy to allow and encourage hospitals to inflate Black patients' eGFR scores based on their race constitutes intentional discrimination under Title VI regardless of any other purported motivation for that policy. See Students for Fair Admissions, 600 U.S. at 290 (Gorsuch, J., concurring) ("Title VI prohibits a recipient of federal funds from intentionally treating any individual worse even in part because of his race, color, or national origin and without regard to any other reason or motive the recipient might assert.").

Moreover, Plaintiffs' Title VI claims can proceed where they have alleged UNOS's deliberate indifference to discrimination by the transplant hospitals. The Supreme Court has held that federal funding recipients may be liable under Title IX where the recipient is deliberately indifferent to known acts of discrimination. Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998). "And the Court has interpreted Title IX consistently with Title VI," Barnes v. Gorman, 536 U.S. 181, 185 (2002), where Title IX was modeled after Title VI, and "[t]he two statutes operate in the same manner, conditioning an offer of federal funding on a promise by the recipient not to discriminate," Gebser, 524 U.S. at 286. Moreover, several circuit courts, and at least one court in this district, have held that allegations of deliberate indifference are sufficient

to state a claim under Title VI. See Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty., OK, 334 F.3d 928, 934 (10th Cir. 2003) ("[D]eliberate indifference to known instances of student-on-student racial harassment is a viable theory in a Title VI intentional discrimination suit[.]"); Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 273 (3d Cir. 2014) ("[D]eliberate indifference may, in certain circumstances, establish intentional discrimination for the purposes of a Title VI claim."); see id. (collecting cases); see also Kestenbaum v. President and Fellows of Harvard College, 743 F.Supp.3d 297, 307–08 & n.8 (D. Mass. August 6, 2024).

    Plaintiffs' factual allegations are sufficient as to UNOS's deliberate indifference to racial discrimination by transplant hospitals via application of the race-based coefficient. "[F]unding recipients are deemed 'deliberately indifferent' . . . where the recipient's response to the [discrimination] or lack thereof is clearly unreasonable in light of the known circumstances." Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 648 (1999). Here, Plaintiffs have alleged that UNOS establishes and implements policy regarding how donor kidneys are awarded, and that its policy "encouraged and allowed for use of the race-based coefficient." See, e.g., Compl. ¶¶ 33, 46 [Doc. No. 1]. Plaintiffs further allege that UNOS was aware that its UNet software "includes an algorithm that uses wait time as the primary factor in ranking patients for donor kidneys," "that its UNet software includes wait times for Black patients that have been manipulated by application of the race-based coefficient," and that the race-based modification was made to Black patients' eGFR scores, including Plaintiffs', but was not applied to other racial groups. Id. ¶ 46.

    That UNOS did not itself apply the race-based coefficient does not preclude liability. Plaintiffs have alleged that UNOS allowed and encouraged hospitals to apply the race-based coefficient "for decades," id. ¶¶ 43, 46, even though it "is based on eugenics-style racism and

12

stereotypes that assume Black Americans are more physically fit than White Americans and other racial groups," and had been critiqued by doctors and in scientific articles as discriminatory and unsupported by scientific evidence, id. ¶¶ 47–49. Even though Plaintiffs have alleged that transplant hospitals were ultimately responsible for calculating eGFR scores and entering them into UNet, it is reasonable to infer from Plaintiffs' allegations that UNOS knew of and was deliberately indifferent to discriminatory calculation of eGFR scores via application of the race-based coefficient.

UNOS points to a document, which it identifies as UNOS's "Prior OPTN Kidney Policy." See UNOS Ex. 1 [ Doc. No. 12-1]. UNOS claims that this document "clearly refutes Plaintiff's unsubstantiated assertion" that UNOS policy "encouraged and allowed" use of the race-based coefficient because it "was silent as to how transplant hospitals should calculate eGFRs." UNOS Mem. 5, 7 [Doc. No. 12]. "[O]rdinarily, a court may not consider any documents that are outside of the complaint" on a motion to dismiss. Diva's Inc. v. City of Bangor, 411 F.3d 30, 38 (1st Cir. 2005) (internal quotations omitted); see also Fed. R. Civ. Proc. 12(d) ("[i]f, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56"). However, "when 'a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged),' then the court can review it upon a motion to dismiss." Diva's Inc., 411 F.3d at 38 (citation omitted).

The Prior OPTN Kidney Policy is not properly before the court where the Complaints' factual allegations are not expressly linked to it and Plaintiffs' claims against UNOS are not "dependent upon" it. The policy document does not preclude the existence of another UNOS policy that allowed and encouraged transplant hospitals to use the race-based coefficient. And a

13

discrimination claim challenging a discriminatory policy need not be based on a written policy. See Hassan v. City of New York, 804 F.3d 277, 295 n.5 (3d Cir. 2015) (collecting cases). It is thus immaterial that Plaintiffs have not "identified any policy statement, press release, or document advocating for the use of a race-based coefficient." UNOS Mem. 7 [Doc. No. 12]. And where Plaintiffs' allegations that UNOS had a policy that allowed and encouraged the use of the race-based coefficient are assumed true on a motion to dismiss, Nisselson, 469 F.3d at 150, Plaintiffs have sufficiently alleged that UNOs has engaged in unlawful discrimination against them via adoption of that policy.

      2.      Federal Financial Assistance—UNOS

UNOS argues that Plaintiffs do not allege that UNOS receives federal financial assistance as Title VI requires, and that UNOS is instead a government contractor compensated for the service of administering the national transplant waitlist. UNOS Mem. 2, 9 [Doc. No. 12].

Regulations implemented by the Department of Health and Human Services to effectuate Title VI define "Federal financial assistance" to include:

> (1) grants and loans of Federal funds, (2) the grant or donation of Federal property and interests in property, (3) the detail of Federal personnel, (4) the sale and lease of, and the permission to use (on other than a casual or transient basis), Federal property or any interest in such property without consideration or at a nominal consideration, or at a consideration which is reduced for the purpose of assisting the recipient, or in recognition of the public interest to be served by such sale or lease to the recipient, and (5) any Federal agreement, arrangement, or other contract which has as one of its purposes the provision of assistance.

45 C.F.R. § 80.13(f). However, "the regulations implementing Title VI, the legislative history, and cases interpreting the term all indicate that market contracts between federal contractors and the government do not constitute" federal financial assistance under the statute. See Venkatraman v. REI Sys., Inc., 417 F.3d 418, 421 (4th Cir. 2005).

Plaintiffs have sufficiently alleged that UNOS receives federal financial assistance via "grants . . . of Federal funds." 45 C.F.R. § 80.13(f). Plaintiffs have alleged that 10% of UNOS's budget is provided by the Federal government, and that UNOS's audited financial statements describe this Federal government payment as a grant with a corresponding "Federal Assistance Lending Number." Compl. ¶¶ 76–77 [Doc. No. 1]. Plaintiffs have further alleged that Federal Assistance Lending Numbers correspond to "Assistance Listings," which list federal programs that provide "assistance awards," including grants and loans. Id. ¶ 77. Annual payments to UNOS thus plausibly constitute a "grant[] of Federal funds."

That UNOS operates the kidney transplant waitlist and receives funding pursuant to a contract does not defeat Plaintiffs' Title VI claim against it. The parties cite no First Circuit case law interpreting the term "Federal financial assistance" in the Title VI context. However, several circuit and district courts have concluded that the same phrase in the Rehabilitation Act requires allegations that an entity received a federal subsidy rather than compensation from the government for products or services. See Welch v. United Network for Organ Sharing, 767 F. Supp. 3d 746 (M.D. Tenn. 2025) (collecting cases). And regulations adopted under Title VI define the phrase to include contracts where one purpose of such agreement is "the provision of assistance." 45 C.F.R. § 80.13(f). UNOS's contract with HHS is not before the court at this stage. Consequently, it is premature to determine whether UNOS's contract with HHS constitutes "Federal financial assistance" or is only compensatory. And where Plaintiffs have alleged that the federal government provides approximately 10% of UNOS's budget, see Compl. ¶ 76 [Doc. No. 1], it is reasonable to infer that the contract acts as a subsidy such that UNOS receives "Federal financial assistance."

15

C. *MPAL Claim*

1. Threshold Requirements for Plaintiffs' MPAL Claims

UNOS argues that Plaintiffs' claims under M.G.L. c. 272, § 98 ("MPAL") should be dismissed because Plaintiffs did not first file complaints with the Massachusetts Commission Against Discrimination ("MCAD"). See, e.g., UNOS Mem. 11 [Doc. No. 12]. Plaintiffs do not contend that they filed a complaint with MCAD. Instead, Plaintiffs argue that they were not required to file a complaint with MCAD before pursuing a public accommodation claim. Opp. to UNOS 21 [Doc. No. 34].

M.G.L. c. 272, § 98, which concerns discrimination in places of public accommodation, provides that "[a]ll persons shall have the right to the full and equal accommodations, advantages, facilities and privileges of any place of public accommodation," and that "[t]his right is recognized and declared to be a civil right." This section also provides for penalties for anyone who "makes any distinction, discrimination or restriction on account of race, color, religious creed, national origin, sex, gender identity, sexual orientation . . . in any place of public accommodation" or who "aids or incites such distinction, discrimination or restriction. Id.

M.G.L. c. 151B also concerns unlawful discrimination. Section 4 of Chapter 151B sets forth "unlawful practices," namely "discrimination by private and public employers against employees or prospective employees[,] by those in the insurance or bonding business, by persons in the mortgage business and persons in the business of selling or renting real estate." CapoDiCasa v. Town of Ware, 2018 WL 3966303, at *3 (D. Mass. Aug. 17, 2018); see also M.G.L. c. 151B, § 4. Section 5 provides procedures for addressing before MCAD both "an alleged unlawful practice" under Chapter 151B and alleged violation of various other statutory provisions including, M.G.L. c. 272, § 98. See id. § 5. Section 5 specifically states, however, that filing a complaint with MCAD "shall not be a bar to proceedings under [M.G.L. c. 272, § 98]."

16

Chapter 151B, Section 9 underscores that "nothing contained in this chapter shall be deemed to repeal any provision of any other law of this commonwealth relating to discrimination." Section 9 then asserts that "the administrative procedure provided in this chapter under section 5 shall, while pending, be exclusive, and the final determination on the merits shall exclude any other civil action, based on the same grievance of the individual concerned," but only "as to acts declared unlawful by section 4."

In <u>Currier v. National Board of Medical Examiners</u>, 462 Mass. 1, 4, 965 N.E.2d 829 (2012), the Massachusetts Supreme Judicial Court ("SJC") analyzed a claim under the Public Accommodations Law and held that the plaintiff was entitled to summary judgment. The SJC noted that under Chapter 151B, a person "who is 'aggrieved' by an alleged violation of the public accommodation statute <u>may</u> file a complaint with the [MCAD.] <u>Id.</u> at 12 (emphasis added). The Court found that "[w]ith the integration of the statute into c. 151B, the Legislature essentially delegated to the [MCAD] the authority in the first instance to interpret the statute and determine its scope" and that the Court was "thus guided in [its] interpretation of the statute by the construction afforded by the [MCAD]." <u>Id.</u> But the SJC took no note of the fact that the plaintiff in <u>Currier</u> had not filed with the MCAD prior to filing suit. "<u>Currier</u> thus supports the conclusion that a plaintiff is not required to proceed first before the MCAD and exhaust her administrative remedies when alleging discrimination in a place of public accommodation." <u>Peters v. Boston Props., Inc.</u>, 2021 WL 3493907, at *4 (Mass. Super. June 15, 2021). That conclusion is consistent with the statutory scheme as detailed above.

In <u>CapoDiCasa</u>, the court similarly concluded that "[Chapter] 151B exhaustion was not a necessary prerequisite to Plaintiff's suit under the Public Accommodation Law." 2018 WL 3966303, *5. The court noted there the similarities between the Public Accommodation Law and

17

Title II of the Americans with Disabilities Act, which also does not concern employment discrimination and does not require the administrative prerequisites required for employment discrimination cases. Id.

Accordingly, the court finds Plaintiffs were not required to first file their MPAL claim with MCAD.

2. Punitive Damages

Plaintiffs seek punitive damages in addition to compensatory and statutory damages. Compl., Prayer for Relief ¶¶ 2–4 [1:24-cv-11692 Doc. No. 1]; Compl., Prayer for Relief ¶¶ 2–4 [1:24-cv-11693 Doc. No. 1]. UNOS argues that Plaintiffs' requests for punitive damages should be stricken because under Massachusetts law, punitive damages are available only where a defendant's conduct is "outrageous or egregious," which Plaintiffs have not sufficiently alleged. UNOS Mem. 14 [Doc. No. 12].[3]

Punitive damages are available to Plaintiffs who prevail on a claim under MPAL. See M.G.L. c. 151B, § 9. However, punitive damages may be awarded "only where the defendant's conduct is outrageous or egregious." Joyce v. Town of Dennis, 720 F.3d 12, 22 (1st Cir. 2013) (citing Haddad v. Wal-Mart Stores, Inc., 455 Mass. 91, 110, 914 N.E. 2d 59 (2009)). "Such an award 'requires a heightened finding beyond mere liability and also beyond a knowing violation of the statute.'" Id. "In determining whether the defendant's conduct was so outrageous or egregious that punitive damages under [in a discrimination claim] are warranted, the fact finder should consider all of the factors surrounding the wrongful conduct" including: (1) whether there

---

[3] UNOS also argues that punitive damages are unavailable under Title VI, but Plaintiffs have clarified that they do not seek punitive damages for their Title VI claims, only for their state law claims. See, e.g., Santos Opp. to UNOS 24 [Santos Doc. No. 34].

18

was a conscious or purposeful effort to demean or diminish the class of which the plaintiff is a part; (2) whether the defendant recklessly disregarded the likelihood of serious harm; (3) the nature of the defendant's conduct after learning that the initial conduct would likely cause harm; (4) the actual harm to the plaintiff; and (5) the duration of the wrongful conduct and any concealment of that conduct by the defendant. Haddad, 455 Mass. at 111.

  Based on Plaintiffs' allegations here, it is plausible that Plaintiffs are entitled to punitive damages. Plaintiffs have alleged UNOS maintained a policy allowing and encouraging race-based adjustments to Black patients' eGFR scores "for decades," and continued this policy for years after public and published criticism of the assumptions underlying the policy. See Compl. ¶¶ 43, 47–49 [Doc. No. 1]. In 2022, UNOS acknowledged in changing its policy that the race-based modifier "led to a systemic underestimation of kidney disease severity for many Black patients" and "may have negatively affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant," id. ¶ 17, but continued to use the race-based coefficient as a default and took no affirmative steps to correct for previous use of the race-based coefficient for more than six months, id. ¶¶ 58–59. Moreover, when UNOS required transplant hospitals to take action, it allowed them one year to request wait time adjustments with UNOS, during which UNet continued to rank candidates for kidneys using wait times calculated using the race-based coefficient. Id. ¶ 59–60. Where Plaintiffs have alleged that UNOS continued to allow and encourage transplant hospitals to use the race-based modifier for years after the practice received public criticism, and where Plaintiffs have alleged that UNOS ultimately acknowledged systemic harm resulting from the practice but delayed addressing the problem, it is plausible that a factfinder would find UNOS's alleged conduct "outrageous or egregious." See Haddad, 455 Mass. at 111.

Where Plaintiffs have plausibly alleged outrageous or egregious conduct, it is premature to strike their requests for punitive damages. Whether punitive damages are warranted is a question of fact to be determined by the factfinder. See Moore v. Indus. Demolition LLC, 138 F.4th 17, 46 (1st Cir. 2025) ("In determining whether the defendant's conduct was so outrageous or egregious that punitive damages . . . are warranted, the fact finder should consider all of the factors surrounding the wrongful conduct." (quoting Haddad, 455 Mass. at 111)). Moreover, "[j]uries have 'wide discretion' to determine the amount of punitive damages, and trial courts have similar discretion to affirm the jury's award of damages." Blockel v. J.C. Penney Co., 337 F.3d 17, 28 (1st Cir. 2003). Where the determination of punitive damages turns on factual issues, and where the fact finder has significant discretion in awarding punitive damages, UNOS's request that Plaintiffs' claims for punitive damages be stricken on a motion to dismiss is denied.

## V.     Conclusion

For the foregoing reasons, UNOS's Motions to Dismiss are GRANTED as to Plaintiffs' requests for injunctive relief as to UNOS. Both Motions to Dismiss are otherwise DENIED.

IT IS SO ORDERED.

September 10, 2025                    /s/Indira Talwani
                                      United States District Judge